UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAISER FOUNDATION HEALTH PLAN, INC.,<br><br>              Plaintiff,<br><br>      v.<br><br>SYLVIA MATHEWS BURWELL,<br><br>              Defendant. | Case No.  14-cv-05255-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 43, 47 |

## I.     INTRODUCTION

The issue in this case is whether Kaiser must pay for emergency care provided to its Medicare enrollee by an out-of-network hospital until the treating physician determines the enrollee is stable to be transferred even if Kaiser believes the physician was mistaken.  The dispute centers on the governing Medicare regulation which provides:  "[t]he physician treating the enrollee must decide when the enrollee may be considered stabilized for transfer or discharge, and that decision is binding on the MA organization."  42 C.F.R. § 422.113(b)(3).  The Secretary of Health & Human Services construes this regulation as making the treating physician's determination binding on Kaiser, effectively fixing Kaiser's financial responsibility.  Kaiser contends that the Secretary has misinterpreted its own regulation, and that the treating physician's determination is subject to review; the Secretary's interpretation would violate Kaiser's Fifth Amendment right against Takings and Due Process.  For the reasons stated herein, the Court finds Kaiser's arguments without merit.

## II.     FACTUAL & PROCEDURAL BACKGROUND

A.     Medicare Framework

Medicare is a federal medical insurance program for the elderly and disabled.  *See* 42

U.S.C § 1395 *et seq*.; Compl. ¶ 9.  The Secretary of Health and Human Services is responsible for the administration of Medicare through its Centers for Medicare & Medicaid Services ("CMS"). 42 U.S.C § 1395b-9; Compl. ¶ 9.  Medicare consists of three parts of insurance: Parts A, B, and C. 42 U.S.C § 1395 *et seq*.  Medicare Part C gives qualified Medicare individuals the option of participating in the Medicare Advantage ("MA")[1] program.  42 U.S.C §§ 1395w-21 to -29; 42 C.F.R. § 422 *et seq*.  The MA program allows eligible individuals to receive their Medicare benefits through Medicare Advantage organizations ("MAO"), which include health maintenance organizations plans ("HMO") such as Kaiser. 42 U.S.C § 1395w-21(a)(2)(A)(i); Compl. ¶ 10.  Part C HMOs are capitated plans, meaning that the federal government pays the plans a flat fee per enrollee, and the HMO then arranges for or pays providers for the services provided to those members. Compl. ¶ 11.  In other words, when the MA program pays the MAO a fixed monthly rate per enrollee, the MAO assumes the risk of providing covered services to the enrollee.  42 U.S.C. §§ 1395w-23(a)(1) to -(a)(3).

Medicare payment decisions involve a multi-layer review beginning with a request with a provider, such as a hospital, for payment from the MAO organization.  If dissatisfied with the initial determination, a provider may file with the MAO a request for standard reconsideration.  42 C.F.R. § 422.582.  A provider dissatisfied with the MAO's decision on reconsideration may appeal the adverse redetermination to a private independent contractor for a reconsideration.  42 C.F.R. § 422.592.  After the contractor renders its decision, a party may appeal an adverse reconsideration decision and request a hearing before an administrative law judge ("ALJ").  42 C.F.R. § 422.600.  Subsequently, a party may request that the Medicare Appeals Council ("MAC")[2] review the ALJ's decision.  42 C.F.R. § 422.608.  The MAC conducts a *de novo* review of the ALJ's decision considering all the evidence of record and may adopt, modify or

---

[1] The MA program was previously named the Medicare+Choice (M+C) program. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 201(b).

[2] Medicare Appeals Council is the council within the Department Appeals Board of the U.S. Department of Health and Human Services.  42 C.F.R. § 405.370 (b).

**United States District Court**
For the Northern District of California

1  reverse the ALJ's decision or remand the case to an ALJ for further proceedings.  42 C.F.R. §

2  405.1100(c).  The decision of the MAC constitutes the final decision of the Secretary.  42 C.F.R. §

3  405.1130.  Thereafter, a party dissatisfied with the Secretary's final decision may seek judicial

4  review.  42 C.F.R. §§ 405.1130, 405.1136.

5        Congress authorized the Secretary to establish guidelines to promote the "efficient and

6  timely coordination of appropriate maintenance and post-stabilization care."  42 U.S.C. § 1395w-

7  22(d)(2).  Pursuant to this authority, the Secretary has promulgated a regulation delineating special

8  rules for emergency and other related services.  42 C.F.R. § 422.113.

9        Section 1395w-22(d)(1)(E) of the Social Security Act[3] states that the MA organization

10  must provide coverage for emergency services without regard to prior authorization or the

11  emergency care provider's contractual relationship with the organization.  65 Fed. Reg. 40, 170,

12  40, 201 (June 29, 2000).  "Implicit in this requirement is the fact that the [MAO] may not require

13  the provider to call for approval of services prior to the point of stabilization."  *Id.* at 40, 201.

14  Accordingly, the implementing regulation 42 C.F.R. § 422.113(b) prohibits an MAO from

15  instructing enrollees to seek prior authorization for emergency or urgently needed services.

16        Although the regulation sets forth certain limitations on the MAO's financial

17  responsibilities,[4] the regulation explicitly provides that the MAO is financially responsible for

18  emergency services provided to evaluate or stabilize an enrollee's emergency medical condition.

19  Title 42 of the Code of Federal Regulations, section 422.113(b)(2) states:

21          (2) MA organization financial responsibility. The MA organization
           is financially responsible for emergency and urgently needed
           services --

23          (i) Regardless of whether the services are obtained within or outside
           the MA organization;

---

26     [3] Title XVIII of the Social Security Act, entitled Health Insurance for Aged and Disabled, was passed by Congress in 1965 as Public Law 89-97, codified as 42 U.S.C. § 1395 *et seq.*, and referred to by its popular name "Medicare."

28     [4] *See* 42 C.F.R. § 422.113(c).

(ii) Regardless of whether there is prior authorization for the services.

(A) Instructions to seek prior authorization for emergency or urgently needed services may not be included in any materials furnished to enrollees (including wallet card instructions), and enrollees must be informed of their right to call 911.

(B) Instruction to seek prior authorization before the enrollee has been stabilized may not be included in any materials furnished to providers (including contracts with providers);

(iii) In accordance with the prudent layperson definition of emergency medical condition regardless of final diagnosis;

(iv) For which a plan provider or other MA organization representative instructs an enrollee to seek emergency services within or outside the plan; and

(v) With a limit on charges to enrollees for emergency department services that CMS will determine annually, or what it would charge the enrollee if he or she obtained the services through the MA organization, whichever is less.

42 C.F.R. § 422.113(b)(2).

The regulation defines an emergency medical condition as:

(i) [A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, with an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in --

(A) Serious jeopardy to the health of the individual or, in the case of a pregnant woman, the health of the woman or her unborn child;

(B) Serious impairment to bodily functions; or

(C) Serious dysfunction of any bodily organ or part.

*Id*. at 422.113(b)(1)(i).  Emergency services are "covered inpatient and outpatient services that are -- (A) Furnished by a provider qualified to furnish emergency services; and (B) Needed to evaluate or stabilize an emergency medical condition."  *Id.* at 422.113(b)(1)(ii).

The regulation further addresses care services provided after an emergency medical condition is stabilized:  "Post-stabilization care services means covered services, related to an emergency medical condition, that are provided after an enrollee is stabilized in order to maintain

4

the stabilized condition, or, under the circumstances described in [422.113(c)(2)(iii)], to improve

or resolve the enrollee's condition." *Id*. at 422.113(c)(1).  Section 422.113(c)(2)(iii) states:

> (2) MA organization financial responsibility.  The MA
> organization --
>
> (iii) Is financially responsible for post-stabilization care services
> obtained within or outside the MA organization that are not pre-
> approved by a plan provider or other MA organization
> representative, but administered to maintain, improve, or resolve the
> enrollee's stabilized condition if --
>
> (A) The MA organization does not respond to a request for pre-
> approval within 1 hour;
>
> (B) The MA organization cannot be contacted; or
>
> (C) The MA organization representative and the treating physician
> cannot reach an agreement concerning the enrollee's care and a plan
> physician is not available for consultation.  In this situation, the MA
> organization must give the treating physician the opportunity to
> consult with a plan physician and the treating physician may
> continue with care of the patient until a plan physician is reached or
> one of the criteria in § 422.113(c)(3) is met . . . .

42 C.F.R. § 422.113(c)(2)(iii).

B.    Procedural Background

Kaiser is a Medicare Advantage Organization ("MAO") that provides Medicare-covered

services to its enrollees through a Medicare Advantage ("MA") plan.  Compl. ¶ 5.  Defendant

Sylvia Mathews Burwell is the Secretary of the Department of Health and Human Services, which

is statutorily responsible for the administration of the Medicare Program under the Social Security

Act. Compl. ¶ 6.  The Medicare Appeals Council acts under a delegation of authority from the

Secretary. Compl. ¶ 6.  *See* Title 42 of the Code of Federal Regulations § 405.1138 ("When a

Federal district court remands a case to the Secretary for further consideration, unless the court

order specifies otherwise, the MAC, acting on behalf of the Secretary, may make a decision, or it

may remand the case to an ALJ with instructions to take action and either issue a decision, take

other action, or return the case to the MAC with a recommended decision.").  *See also* 42 U.S.C.

§§ 1395ff(b)(1)(C), (b)(2), f(1)(v) (describing the MAC's decision as the "Secretary's final

decision" and "final agency action.");  42 C.F.R. § 405.1130 (stating that "[t]he MAC's decision is

final and binding on all parties . . . .").

Non-party provider Prime Healthcare Services, Inc. ("Prime") owns and operates acute care hospitals, including Chino Valley Medical Center ("Chino Valley").  Compl. ¶ 7.  Kaiser's affiliate, Kaiser Foundation Hospitals, owns and operates "in-plan" hospitals through which Kaiser members are served.  Compl. ¶ 13.  Chino Valley does not belong to Kaiser's network.

In the case at bar, Kaiser's enrollee was enrolled in Kaiser's Senior Advantage Plan.  Compl. ¶ 44.  On May 7, 2011 at 3:39 p.m., the enrollee came to Chino Valley ("Chino Valley") Emergency Department complaining of high blood pressure and a headache.  Compl. ¶ 45; AR 247.  On May 7, 2011 at 5:00 p.m., the Chino Valley Attending Physician filled out an "Emergency Department's Transfer Stability Assessment" checklist and determined that the enrollee was "unstable for transfer."  Compl. ¶ 49; AR 225, Ex. D.  The physician checked all seven boxes for criteria for instability, including a need for intensive vital sign and telemetry monitoring, low, high or fluctuating blood pressure, a need for medication for stabilization of vital signs, and a need for transport higher than EMT level 1.  AR 225, Ex. D.  On May 8, 2011 at 5:20 a.m., a physician determined that the enrollee was "unstable for discharge/transfer" due to required "[t]elemetry monitoring ."  AR 226, Ex. D.  On May 8, 2011 at 3:58 p.m., a physician determined the enrollee "stable" and discharged the enrollee home.  AR 234, 236, 238, Ex. D; Compl.  ¶ 58.  Chino Valley's emergency department transfer stability assessment form used in this case states: "Unstable for transfer, due to one or more of the following criteria . . . ."  AR 225, Ex. D.  A checklist is provided, but the physician made certain judgments before filling out the transfer stability assessment form:

> I was the Emergency Department Physician who evaluated [the enrollee] when he presented to Chino Valley Medical Center on May 7, 2011 at 1550 hours.  The Chief Complaint upon presentation was Headache with an elevated blood pressure.  Upon evaluation, I was advised by [the enrollee] that he ha[d] a pressure type frontal headache for two (2) days in duration.  In addition, I was advised that he had terminated his hypertension medication.  Upon evaluation, blood pressure was 161/86, pulse 74 and respirators 20.  Following evaluation, my differential diagnosis included, but not limited to acute cephalgia and headache secondary to increased intracranial pressure secondary to CVA.  Accordingly, I continued to monitor the patient within the Emergency Room wherein it was

noted that the patient's headache did not improve.  In addition, the patient's hypertension became problematic wherein it was elevated at 178/80.  Given the foregoing, I was of the impression that the patient was unstable for transfer at the time of the admission on May 7, 2011 due to the likelihood and/or potential of material deterioration.  I discussed the case with admitting physician and the patient was ultimately admitted.  I contemporaneously noted within the records that the patient was unstable for transfer at the time of admission due to my clinical assessment and based upon my training, experience and education.

Madahar, M. D. Decl. ¶¶ 5-8.

When Chino Valley billed Kaiser for the enrollee's treatment, Kaiser refused to pay for services after the point it believes the patient was stable and could have been transferred to a Kaiser's in-network facility.  According to Kaiser, "[t]hat point was nearly 24 hours before the hospital ultimately deemed him stable and sent him home."  Docket No. 43 at 2. ("Kaiser's MSJ").  Kaiser paid Chino Valley for emergency stabilization services provided on May 7th, but refused to pay for inpatient services provided on May 8th. AR 220.  Kaiser explained: "[p]er our physician review, the member was clinically stable for transfer in-Plan after evaluation and treatment in the emergency room.  We did not authorize the hospital to provide the post-stabilization inpatient care received after that." AR 220.

Chino Valley disputed Kaiser's decision with Kaiser.  AR 206.  Kaiser rejected Chino Valley's claim.  AR 223.  Chino Valley appealed Kaiser's denial to Maximus Federal Services ("Maximus"), a private contractor that reviews Medicare disputes. AR 173.  Maximus sided with Kaiser explaining that the enrollee was stable for transfer by 6:10 p.m. on May 7, therefore the post-stabilization care was medically unnecessary.  AR 175.  Chino Valley appealed Maximus's decision to an Administrative Law Judge, who upheld Maximus's decision. AR 77.

The ALJ concluded that the enrollee was stable in advance of what was indicated by Chino Valley's physician. AR 76.  Thus, Kaiser did not have to pay Chino Valley for the unapproved post-stabilization care provided from May 7, 2011 through May 8, 2011.  AR 76.  In her decision, the ALJ questioned the credibility of the Chino Valley' stability assessment form and determined that the enrollee was admitted to telemetry in stable condition.  AR 76.  The ALJ did not discuss the regulation 42 C.F.R. § 422.113(b)(3).  AR 66-77.

Chino Valley requested review by the Medicare Appeals Council.  AR 35.  Chino Valley set forth two reasons for its appeal:  (1) the ALJ should have deferred to the documented judgment of the physician; and (2) the ALJ ignored that there were specific contemporaneous statements by the emergency room physician that the enrollee was unstable for transfer.  AR 40-41.  The MAC reversed the ALJ's decision.  AR 16.

The MAC held that "the MA plan must pay for the enrollee's care until her treating physician determined that she was stable and could safely be transferred."  AR 4.  Accordingly, Kaiser was "responsible for the costs of the pre-stabilization emergency received by its enrollee from [Chino Valley] based on the treating physician's binding determination that the enrollee was not stable for transfer until 3:58 P.M. on May 8, 2011, at which point the enrollee was discharged."  AR 16.  In reaching the decision, the MAC stated:

> Because the treating physician at the emergency provider retains responsibility for the plan of care until a transfer of care is accomplished, the regulation at 42 C.F.R. § 422.113(b)(3) establishes a clear rule:  "The physician treating the enrollee **must decide when** the enrollee may be considered **stabilized for transfer or discharge**, and **that decision is binding** on the [MAO]."
>
> Thus, the ALJ is **not** empowered under the regulations to simply reach a conclusion *de novo* as to the point at which **he** believes the enrollee became sufficiently stable to be safely transferred to Kaiser, but must first inquire whether and when the treating physician made that determination.  When **documented** in the contemporaneous medical records, the treating physician's decision with respect to when the enrollee stabilized for transfer or discharge **binds** both the MAO and subsequent adjudicators.  **By definition**, post-stabilization care does not begin until after the treating physician decides the enrollee is stabilized for transfer or discharge.

AR 11-12 (emphasis in original).

The MAC's decision is the final decision of the Secretary from which Kaiser now appeals and seeks judicial review in this Court. Docket No. 43; *Heckler v. Ringer*, 466 U.S. 602, 607 (1984); 42 U.S.C. § 405(g).

## III.   DISCUSSION

A.   Legal Standard

The crux of the parties' dispute involves the interpretation and application of the regulation

**United States District Court**
For the Northern District of California

relating to the physician's determination that the patient is stabilized. 42 C.F.R. § 422.113(b)(3). The issue is whether that termination by the treating physician is binding on Kaiser in respect to its financial obligation to pay for emergency care up until the point of stabilization.

At the outset, it should be noted that Congress granted the Secretary broad authority to prescribe such regulations as necessary to effectuate the administration of the Medicare program. 42 U.S.C. § 1395hh(a)(1) ("The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."). In carrying out that mandate, the Secretary established a clear rule that the treating physician "must decide when the enrollee may be considered stabilized for transfer or discharge, and that decision is binding on the [MAO]." 42 C.F.R. § 422.113(b)(3). Further, the Secretary through the MAC's decision in this case made clear that the provision on stabilized condition should be read to create financial responsibility on the part of the MA plan whenever a treating physician determines that a patient is not stable. 42 U.S.C. §§ 1395ff(b)(1)(C), (b)(2), f(1)(v) (describing the MAC's decision as the "Secretary's final decision" and "final agency action."); 42 C.F.R. § 405.1130 (stating that "[t]he MAC's decision is final and binding on all parties . . . ."); AR 13. As noted above, 42 C.F.R. § 422.113(b) and (c) sets forth the MAO's financial responsibility during and after a medical emergency which is marked by the patient's stability.

Kaiser takes issue with the Secretary's interpretation. The parties dispute the level of deference owed to the Secretary. Kaiser challenges the Secretary's interpretation of its own regulation, and argues the agency's construction of its regulation, which implements a statute, is not entitled to deference. Kaiser's MSJ at 13 n.9. By contrast, the Secretary argues that the Court "'must give substantial deference to an agency's interpretation of its own regulations.'" Secretary's MSJ at 10, 23 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). As discussed below, the more deferential standard applies.

When Congress explicitly leaves a gap for an agency to fill, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation"; any ensuing regulation is generally entitled controlling weight unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. *Chevron U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984).  In *United States. v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), the Supreme Court reiterated this principle:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

Furthermore, as the Supreme Court has repeatedly recognized, courts may properly resort to the views of an agency implementing a statute for guidance and should in fact afford considerable weight to an agency's construction of a statutory scheme it is entrusted to administer because the agency's interpretations are founded upon a body of experience and informed judgment. *Id.* at 227-28 (citations omitted).  That is the case here.  Congress has bestowed broad authority upon the Secretary to promulgate regulations as may be necessary to carry out the Medicare program and expressly delegated authority to the Secretary to establish requirements needed to promote the "efficient and timely coordination of appropriate maintenance and post-stabilization care."  42 U.S.C. § 1395hh(a)(1); 42 U.S.C. § 1395w-22(d)(2).

Moreover, as here, an agency interprets its own regulations, that interpretation receives "substantial deference."  *Thomas Jefferson Univ.*, 512 U.S. at 512 (citation omitted).  In *Thomas*, petitioner challenged the Secretary's interpretation of 42 C.F. R. §§ 413.859(c) under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*  The Supreme Court held in *Thomas Jefferson Univ.*, 512 U.S. at 506:

> [T]he agency's interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." . . . [W]e must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of [the agency's] intent at the time of the regulation's promulgation.

*Id.* at 521.  The Court concluded that "[t]he Secretary's reading" was "a plausible interpretation of

**United States District Court**
For the Northern District of California

the regulation" and "faithful to the regulation's plain language." *Id.* at 514, 518. *See Conahan v. Sebelius*, 659 F.3d 1246, 1249 (9th Cir. 2011) (upholding the MAC's decision and stating that [t]he agency's interpretation of its own regulations receives "substantial deference" (citing *Thomas Jefferson Univ.*, 512 U.S. at 512(1994)).

The Court's language in *Thomas Jefferson* has been described as "an indulgent if not downright abject standard of deference." Robert A. Anthony, Which Agency Interpretations Should Bind the Courts?, 7 Yale J. on Reg. 1, 4 (1990). It is more deferential than the *Chevron* doctrine. *Cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").

*See Gose v. U.S. Postal Serv.*, 451 F.3d 831, 837 (Fed. Cir. 2006) ("We defer even more broadly to an agency's interpretations of its own regulations than to its interpretation of statutes, because the agency, as the promulgator of the regulation, is particularly well suited to speak to its original intent in adopting the regulation."); *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005) ("[I]t is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts. Deference to an agency's interpretation of its own regulations is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own."); *Am. Express Co. v. United States,* 262 F.3d 1376, 1382-83 (Fed. Cir. 2001) (holding that because "we are not dealing with an agency's interpretation of a statute and issues of *Chevron* deference, but with the IRS's interpretation of an ambiguous term in its own Revenue Procedure . . . substantial deference is paid to an agency's interpretations reflected in informal rulings"); *Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor v. E. Associated Coal Corp.*, 54 F.3d 141, 147 (3d Cir. 1995) ("We accord greater deference to an administrative agency's interpretation of its own regulations than to its interpretation of a statute.").

Although courts give deference to the agency's interpretation of relevant Medicare statutes

and regulations, "[t]he interpretation must sensibly conform to the purpose and wording of the regulations." *St. Elizabeth Cmty. Hosp. v. Heckler*, 754 F.2d 587, 592 (9th Cir. 1984).  If the agency's interpretation is inconsistent with relevant Medicare statutes and regulations, they will not be upheld.  *County of Los Angeles v. Sullivan*, 969 F.2d 735, 740 (9th Cir. 1992).

B.      The Secretary's Interpretation is Consistent With the Regulation and Governing Statutes

Kaiser first challenges the "impermissible interpretation and application of 42 C.F.R. § 422.113(b)(3)."  Kaiser's MSJ at 1.  In the alternative, Kaiser argues that even if the MAC's reading of the regulation is permissible, the Secretary exceeded her authority in promulgating the regulation inconsistent with the Medicare Act.  MSJ at 25.

1.      The MAC's Interpretation of the Regulations

Kaiser argues that the MAC acted arbitrarily and contrary to the plain language of 42 C.F.R. § 422.113(b)(3) when it (1) determined that the provision on stabilized condition should be read to create financial responsibility on the part of the MA plan whenever a treating physician determines that a patient is not stable and (2) categorically precluded the consideration of relevant evidence as to whether the physician rendered an actual medical decision.  Kaiser's MSJ at 13, 18. In challenging the Secretary's interpretation, Kaiser contends that the plain text of the regulation does not support the MAC's reading.  Instead, according to Kaiser, section 422.113(b)(3) limits its application to transfer disputes and requires the MAO to defer only to the decision of the treating physician to physically transfer or discharge a patient; it does not determine whether the enrollee is stable for purposes of Kaiser's financial responsibility.  Kaiser's MSJ at 14.

Kaiser's attempt to divorce the duty of assuming the *provision* of emergency care without prior authorization from the obligation to *pay* for that care runs counter to the regulatory scheme. The MAC's interpretation is a reasonable construction of the application regulation.  As the Secretary contends, the language of 42 C.F.R. § 422.113(b)(3) which makes the treating physician's determination of stability binding on the MAO applies to the MAO's financial responsibility for emergency medical care.  As noted above, the MAO "may not require the provider to call for approval of services prior to the point of stabilization" during the provision of emergency medical services.  65 Fed Reg. 40, 201 (June 29, 2000).  By implication, such approval

refers to approval in order to secure the MAO's financial responsibility for that care.  Moreover, §

422.113(b)(3) must be viewed in the context of the regulatory scheme of which it is a part, a

scheme that explicitly addresses MAO's financial responsibility for emergency services and post-

emergency services.  *See* 42 C.F.R. § 422.113(b)(2) (establishing MAO financial responsibility for

emergency services) and § 422.113(c)(2) (addressing MAO financial responsibility after

stabilization).[5]  The regulation employs stabilization as a marker between emergency and post-

emergency services and the MAO's financial responsibility therefor.  Thus, the MAO's conclusion

that § 422.113(b)(3)'s provision making the treating physician's determination of stability

financially (as well as medically) binding on the MAO is a reasonable one, consistent with the

scheme and structure of the regulation.

The regulation and the MAC's interpretation thereof is consistent with the governing

statutes as well.  Section 1395w-22(d)(1)(E) of Title 42 of the U.S. Code provides that a MAO

organization offering a MA plan may select the providers "so long as" coverage is provided for

emergency services (as defined in [1395w-22 (d)(3)(A)]) without regard to prior authorization or

the emergency care provider's contractual relationship with the MAO organization:

> (d) Access to services
>
> (1) In general

---

[5] The MAO is held financially responsible for post-stabilization care services that are not pre-approved only if:

> (1) the MA does not respond to a request for pre-approval within 1 hour,
>
> (2) the MA organization cannot be contacted, and
>
> (3) when the MA organization representative and the treating physician cannot reach an agreement concerning the enrollee's care and a plan physician is not available for consultation.  42 C.F.R. § 422.113(c)(2)(iii)(A)(B)(C).  The MAO's financial responsibility for unapproved post-stabilization services ends when an MA's physician assumes the responsibility for the enrollee's care through transfer or when the enrollee is discharged.

42 C.F.R. § 422.113(c)(3)(ii)(iv).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

> A Medicare+Choice organization offering a Medicare+Choice plan may select the providers from whom the benefits under the plan are provided so long as–
>
> (E) coverage is provided for emergency services (as defined in [1395w-22 (d)(3)(A)]) without regard to prior authorization or the emergency care provider's contractual relationship with the organization.

42 U.S.C. § 1395w-22(d)(1)(E).

Under section 1395w-22 (d)(3)(A), Congress defined "emergency services" as: "covered inpatient and outpatient services that -- (i) are furnished by a provider that is qualified to furnish such services under this subchapter, and (ii) are needed to evaluate or stabilize an emergency medical condition (as defined in [§ 1395w-22 (d)(3)(B))."   42 U.S.C. § 1395w-22(d)(3)(A). [6]

These statutory provisions thus link the MAO's duty to provide "coverage" for emergency services for stabilization of the enrollee.  "Coverage" can fairly be read as implying the obligation of the MAO to pay for such emergency services.  And emergency services is statutorily defined in part by stability of the medical condition.  Hence, the regulation is consistent with the statute.

In sum, Kaiser's attempt to distinguish between medical transfer and financial responsibility in interpreting the stability requirement of 42 C.F.R. § 422.113(b)(3) ignores "the obvious fact that transfer disputes between the MAO and the out-of-network emergency provider . . . will invariably be based on concerns about payment."  Secretary's MSJ at 17.  Once an enrollee's emergency medical condition stabilizes, the MA's financial responsibility for out-of-network services that are not authorized becomes very limited.  *See* 42 C.F.R. § 422.113(c).  Accordingly, the Secretary's interpretation of the regulations is neither plainly erroneous nor inconsistent with the regulation or governing statutes; it is well within the bounds of reasonable interpretation.  *Thomas Jefferson Univ.*, 512 U.S. at 512.

---

[6] Section 1395w-22 (d)(3)(B) of the Act defines the term "emergency medical condition" as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

14

C.      The Regulation Does Not Conflict With the Medicare Statute

Kaiser also argues that the regulation 42 C.F.R. § 422.113(b)(3) conflicts with the Medicare statute 42 U.S.C. § 1395w-22(d)(2). Kaiser's MSJ at 25. Section 1395w-22 (d)(2) ("Guidelines respecting coordination of post-stabilization care") states that MAOs "shall comply with such guidelines as the Secretary may prescribe relating to promoting efficient and timely coordination of appropriate maintenance and post-stabilization care of an enrollee after the enrollee has been determined to be stable under section 1395dd of this title." 42 U.S.C. § 1395w-22(d)(2).

Kaiser reads this provision to impose an affirmative obligation on the treating physician to apply EMTALA's definition of "stability." Kaiser's MSJ at 18. Under the Federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), any hospital that accepts payment from Medicare must treat patients who seek emergency services without inquiry into the patient's insurance coverage or ability to pay until the patient's condition has been stabilized. 42 U.S.C. § 13955dd. Section 1395dd prohibits transfer of emergency patients not yet stabilized. *Id.* EMTALA states that with respect to an emergency medical condition, "the term 'stabilized' means . . . that **no material deterioration** of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility[]." 42 U.S.C. § 1395dd(e)(3)(B) (emphasis in original).

Title 42, United States Code, § 1395w-22 (d)(2) provides:

> (2) Guidelines respecting coordination of post-stabilization care
>
> A Medicare+Choice plan shall comply with such guidelines as the Secretary may prescribe relating to promoting efficient and timely coordination of appropriate maintenance and post-stabilization care of an enrollee after the enrollee has been determined to be stable under section 1395dd of this title.

42 U.S.C. § 1395w-22.

Title 42, United States Code, § 1395dd(e)(3)(B)provides:

> (B) The term "stabilized" means, with respect to an emergency medical condition described in [§ 1395dd(e)(1)(A)], that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the

15

individual from a facility, or, with respect to an emergency medical condition described in [§ 1395dd(e)(1)(B)], that the woman has delivered (including the placenta).

42 U.S.C. § 1395dd(e)(3)(B).[7]  *See* 42 C.F.R. § 489.24(b).  ("Stabilized means, with respect to an "emergency medical condition" as defined in this section under paragraph (1) of that definition, that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility or, with respect to an "emergency medical condition" as defined in this section under paragraph (2) of that definition, that the woman has delivered the child and the placenta.")

In this case, the Chino Valley physician used the Transfer Stability Assessment Form that borrowed its factors from Medi-Cal.[8]  Compl. ¶ 36.  The Medi-Cal's consultant guideline is more precise and states, among other things, that "patients with low, extremely high, or rapidly fluctuating blood pressure are *not* stable." (emphasis in original).  Medi-Cal's Criteria Manual Chapter 5.4, Stable for Transport Guidelines.  As a result, according to Kaiser, "when Prime physicians utilize the Medi-Cal guidelines instead of the applicable Medicare standard [*i.e.* EMTALA], MA patients are frequently declared unstable for transfer, requiring admission as inpatients to the Prime hospital, when in fact they could be safely transferred to an in-network hospital."  Compl. ¶ 38.  Because the enrollee in this case was a Medicare enrollee, not a Medi-Cal

_____

[7] EMTALA was originally enacted in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act of 1985. Medicare and Medicaid Budget Reconciliation Amendments of 1985, Pub. L. No. 99-272, § 9121(b), 100 Stat. 164.  Congress was responding to "a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured."  H.R. Rep. No. 241, 99th Cong., 1st Sess. Pt. 3, 5 (1985).  The Act was primarily designed to address "patient dumping," the practice of turning away or transferring indigent patients without evaluation or treatment.  *See Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996) (en banc).  EMTALA imposes two specific duties on a hospital — the duty to provide "an appropriate medical screening examination," and the duty to "stabilize" any emergency medical conditions detected by the medical staff before transferring or discharging the patient. 42 U.S.C. § 1395dd(a); 1395dd(b).  As to the duty to "stabilize," EMTALA provides that where "the hospital's medical staff determines that there is an emergency medical condition, then . . . the staff must 'stabilize' the patient before transferring or discharging the patient." *Bryant*, 289 F.3d at 1165 (citing 42 U.S.C. § 1395dd(b)(1)).

[8] Medi-Cal is California's state Medicaid healthcare program.

1    enrollee, the MAC agreed with Kaiser that the Medi-Cal consultant guideline was inapplicable.

2    AR 14.

3         Kaiser argues had EMTALA been applied, the enrollee would have been deemed stable for

4    transfer.  Kaiser's MSJ at 19.  More specifically, Kaiser challenges a "rote application of

5    inflexible, pre-determined factors" from Chino Valley's "Emergency Department's Transfer

6    Stability Assessment" checklist.  AR 225, Ex. D.

7         There are two problems with Kaiser's argument.  First, even if the treating physician erred

8    in applying the precise legal standard for stabilization, the regulations discussed above make clear

9    that the treating physician's determination of stability is "binding" on the MAO.  As the Secretary

10   properly contends:

11

12            Apart from being contrary to the governing regulation [42 C.F.R. §
               422.113(b)(3)], plaintiff's argument  [permitting an MAO to second-
13            guess the judgment of the treating physician] runs contrary to the
               Congressional purpose underlying EMTALA, which ensures that
14            hospitals do not transfer or discharge patients too soon, before it is
               safe to do so (assuming that appropriate treatment can be provided
15            by the hospital).  Plaintiff proposes to second-guess the treating
               physician's stability judgment for precisely the opposite purpose, to
16            require that treating physicians deem enrollees stable as soon as
               possible so that MAOs like plaintiff can minimize the extent of their
17            out-of-network costs, potentially at the expense of a patient's safety.

18   Secretary's MSJ at 3.

19        Second, in any event, it is not clear that the treating physician's utilization of a different

20   standard of stabilization materially affected the outcome.  Consistent with the main thrust of

21   EMTALA's definition of "stabilized," the treating physician in this case was "of the impression

22   that the patient was unstable for transfer at the time of admission on May 7, 2011 due to the

23   likelihood and/or potential of *material deterioration*.  [He] discussed the case with admitting

24   physician and the patient was ultimately admitted."  Madahar, M. D. Decl. ¶ 7; AR 136 (emphasis

25   added).

26        Moreover, although Kaiser criticized the use of a checklist in assessing stabilization here,

27   the word "stabilized" is "purely contextual or situational," and requires the physician "to make a

28   fast on-the-spot risk analysis."  *Cherukuri v. Shalala*, 175 F.3d 446, 449-50 (6th Cir. 1999).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   EMTALA's definition of "'stabilization' establishes an 'objective' standard of 'reasonableness'

2   based on the situation at hand." *Id.* at 450.  Under this objective standard of reasonableness,

3   EMTALA does not preclude the use of a checklist.  And contrary to Kaiser's argument, the fact

4   that a checklist was used did not mean the treating physician did not exercise judgment (rather

5   than a "rote" decision) in making a medical decision, as the regulations require.  *See* 42 C.F.R. §

6   422.1139(b)(3) ("The physician treating the enrollee must decide when the enrollee may be

7   considered stabilized for transfer or discharge, and that decision is binding on the MA

8   organization.").  The emergency department physician did make an independent medical

9   evaluation and only then made a stability decision with the help of a checklist.  Madahar M. D.

10  Decl. ¶ 7; AR 136.

11       In sum, the MAC's interpretation of the Medicare regulation 42 C.F.R. § 422.113(b)(3)

12  promulgated under the broad Congressional authority, is neither plainly erroneous nor inconsistent

13  with the regulation.  *See Thomas Jefferson Univ.*, 512 U.S. at 512.  The regulation clearly

14  indicates that the binding effect of the treating physician's determination of stabilization applies to

15  Kaiser's financial obligation.  Although the Court recognizes the serious policy concerns raised by

16  Kaiser about potentially perverse financial incentives for a provider to prolong medical emergency

17  status at the expense of MAOs, the Court cannot conclude that the agency's interpretation of

18  existing regulations and governing statute is unreasonable.  Kaiser's concerns are thus better

19  addressed to the regulatory process and/or Congress.

20  D.    Constitutionality

21       Alternatively, Kaiser contends even if the Court accepts the MAC's interpretation, the lack

22  of any meaningful administrative or judicial review of the treating physician determination of

23  stabilization when the determination is contemporaneously documented, violates Kaiser's due

24  process rights.  Compl. ¶ 82; Kaiser's MSJ at 24 (citing *Matthews v. Eldridge*, 424 U.S. 319, 333

25  (1976)).

26       To bring a constitutional procedural due process claim, a plaintiff must show (1) a

27  deprivation by the government, (2) of a liberty or property interest, (3) without due process of law.

28  *See Lightfoot v. District of Columbia*, 273 F.R.D. 314, 319 (D.D.C. 2011).  Accordingly, such a

claim requires the Court first to determine whether plaintiffs have asserted a liberty or property

interest protected by the due process clause, and, if they have, next to determine whether a state

actor caused any deprivation of that interest (before deciding what, if any, process was due). *See*

*Simms v. District of Columbia*, 699 F.Supp.2d 217, 224 (D.D.C. 2010). Thus, Kaiser must first

establish it has a property interest sufficient to trigger due process protection. *Schroeder v.*

*McDonald*, 55 F.3d 454, 462 (9th Cir. 1995); *see also Guzman v. Shewry*, 552 F.3d 941, 953 (9th

Cir. 2009).

In its pleadings, Kaiser does not describe its property interest and cites no cases applicable

to the situation here. In this case at bar, there is no cognizable property interest because the

government is regulating Medicare funding it provides. Participation in the Medicare program is a

voluntary undertaking. *Livingston Care Ctr., Inc. v. United States*, 934 F.2d 719, 720 (6th Cir.

1991). In *Idaho Health Care Association v. Sullivan*, 716 F. Supp. 464, 472 (D. Idaho 1989), the

court rejected a due process challenge to nursing home admission regulations applicable to nursing

homes participating in Medicaid. The court noted that "[d]espite the financial benefits available to

a participant in Medicaid, the nursing homes' decision to come under the system is nonetheless

voluntary." *Id*.

The federal government pays Kaiser a flat fee per enrollee, which means that Kaiser

assumes the risk of providing covered services to the beneficiary. Compl. ¶ 11; 42 U.S.C. §§

1395w-23(a)(1) to -(a)(3). MAOs, however, have no property interest in Medicaid or Medicare

payments. *See Guzman v. Shewry,* 552 F.3d 941, 950, 953 (9th Cir. 2009) (holding that because

there is no constitutionally-protected property right to Medicaid payments, there is no right to a

pre-suspension hearing). As a corollary, MAOs have no constitutionally cognizable property

interest in preventing the expenditure of such funds where mandated as a condition of receipt of

such funds.

Furthermore, a regulation granting broad discretion to a decision-maker does not create a

property interest. *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980). "To have a property

interest in a benefit, a person 'must have a legitimate claim of entitlement to it.' 'Entitlements are

created by rules or understandings from independent sources, such as statutes, regulations, and

19

United States District Court
For the Northern District of California

1  ordinances, or express or implied contracts.'" *Erickson v. United States ex rel. Dep't of Health &*

2  *Human Serv.*, 67 F.3d 858, 862 (9th Cir. 1995) (internal citations omitted).  "Whether an

3  expectation of entitlement is sufficient to create a property interest will depend largely upon the

4  extent to which the statute contains mandatory language that restricts the discretion of the

5  decisionmaker." *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990) (internal

6  quotation marks and brackets omitted).  Here, the regulation states that the physician "must

7  decide" when the enrollee may be considered stabilized and that determination is "binding on the

8  MA organization." 42 C.F.R. § 422.113(b)(3).  This wide discretion resting with the physician

9  negates Kaiser's claim to a protectable property interest created by the State.  *Jacobson*, 627 F.2d

10  at 180.  In short, Kaiser has failed to establish any property interest, the deprivation of which is

11  entitled to due process of law.

12      Similarly, no taking of property without just compensation has occurred on this record.

13  Compl. ¶ 83.  The "Takings Clause" of the Fifth Amendment provides that private property shall

14  not "be taken for public use, without just compensation."  U.S. Const. Amend. V.  The threshold

15  question in any takings case is whether the plaintiff has a protected property interest.  *See*

16  *Turnacliff v. Westly*, 546 F.3d 1113, 1118-119 (9th Cir. 2008) (internal citations omitted).  As

17  discussed above, Kaiser was unable to make this showing.  Even if Kaiser could establish a

18  property interest, there is no compulsion to participate in the Medicare program.  "Where a service

19  provider voluntarily participates in a price regulated program or activity, there is no legal

20  compulsion to provide service and thus there can be no taking." *Garelick v. Sullivan*, 987 F.2d

21  913, 916 (2d Cir.1993) (citations omitted).

22      In sum, the challenged Medicare regulation does not violate the Fifth Amendment.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

### IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Secretary's cross-motion for summary judgment and **DENIES** Kaiser's motion for summary judgment.

This order disposes of Docket Nos. 43 and 47.

**IT IS SO ORDERED**.

Dated: November 30, 2015

_____
EDWARD M. CHEN
United States District Judge